IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TAMMY H. HOWELL,**                    Case No. 1:17 CV 316

    Plaintiff,                         Judge Christopher A. Boyko

    v.                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                         REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Tammy Howell ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated February 16, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in June 2014, alleging a disability onset date of January 1, 2013.[1] (Tr. 149). Her claims were denied initially and upon reconsideration. (Tr. 80, 96). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 112). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 28, 2016. (Tr. 40-64). On August 12, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr.

---

1. Plaintiff later amended her alleged onset date to May 9, 2014. *See* Tr. 43-44.

21-34). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on February 15, 2017. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in June 1967, and was 49 years old at the time of the ALJ hearing. *See* Tr. 44, 149. Plaintiff had an eighth-grade education in special education classes, and a GED. *See* Tr. 45, 52. Plaintiff was divorced, and lived with a friend, but did not pay rent. (Tr. 45). Plaintiff testified she had last worked doing assembly work in 2005. (Tr. 46-47).

Plaintiff described why she felt she was disabled:

> At this time it's my neck, my shoulder and my back with all the pain that I have throughout the day, and all the breaks that I take throughout the day when I'm doing something. I don't believe I could do a job. And then with my mental problems I'm afraid that I might have an anger outburst and hurt someone.

(Tr. 48). For treatment, Plaintiff took pain medicine for her back, and went to physical therapy for her neck and shoulder. *Id.* She anticipated an MRI after physical therapy concluded. *Id.*

Plaintiff also testified to problems with her left knee. (Tr. 52). She got migraine headaches at least once per week. *Id.* When the migraines occurred, she took medicine and laid down, and was "usually out for two days". *Id.* Plaintiff also had COPD. (Tr. 54-55).

Plaintiff testified that for her mental health treatment, she took Valium and Ativan, saw a counselor once per week, and saw a psychiatrist once or twice per month. (Tr. 49). She thought these measures were helping. *Id.* She had been in counseling for two years to address anger and depression. (Tr. 54-55).

Plaintiff estimated she could stand in one place for ten minutes before having to move due to "sharp pains in [her] lower back that run[] up to the middle of [her] back." (Tr. 49). At that

point, she would have to "[e]ither shift or sit down." *Id.* She would have to sit for twenty minutes before standing back up. *Id.* Walking was "[a]bout the same" as standing. *Id.* Plaintiff used a cane sometimes, when her back was "really, really hurting or [her] sciatic nerve[] [pain was] really bad." (Tr. 49-50). Plaintiff estimated she could sit for half an hour, but would have pain during that time. (Tr. 50). She could lift "[n]o more than five pounds", and could lift a gallon of milk with her left hand. *Id.* Plaintiff also testified to difficulty bending, kneeling, crouching, as well as reaching overhead or out in front of her with her right arm. (Tr. 51). She had trouble with grip in her right hand. *Id.* Plaintiff testified as to how she got through her days:

> I stand for a little while, I can stand for about 10, 15 minutes, then I sit down or shift my weight to this side. I don't stand a lot permanent on my feet. When I'm sitting I can only sit for 20 minutes then my back starts hurting so I get up and walk around a little bit to relieve that. Still I have pain.

(Tr. 53). She spent the most time in the recliner. *Id.*

Plaintiff's roommate did most of the household work, but she testified she folded clothes, loaded the dishwasher, and cleaned her bathroom. *Id.* Plaintiff also shopped for groceries, and went to doctor appointments. (Tr. 54).

Relevant Medical Evidence

*Physical Health*

In May 2014, Plaintiff went to the emergency room with right back and arm pain. (Tr. 249). On examination, Plaintiff had decreased range of motion, pain and spasm in her cervical spine, and tenderness around her right scapula. (Tr. 250). She was assessed with musculoskeletal pain, and discharged with prescription medication. (Tr. 252).

Plaintiff then saw Sherry Adkins, M.D., at Family Health Center for a follow-up visit. (Tr. 272-74). She requested a rheumatology referral, wanted to change her anxiety medication, and wanted a cane due to knee pain. (Tr. 272). She reported back, neck, and knee pain. *Id.* On

examination, Dr. Adkins found some tenderness in Plaintiff's right arm. (Tr. 273). She assessed Plaintiff with uncontrolled anxiety, discussed medication options, and referred her to a psychiatrist. *Id.* She also assessed bilateral knee pain, which she found most consistent with bursitis, and referred Plaintiff for an orthopedic consultation. (Tr. 273-74).

In June 2014, Plaintiff saw Eric Koperda, M.D., at Family Health Center. (Tr. 275). Her physical examination was normal. (Tr. 276). Plaintiff reported she was unable to reach a psychiatrist, and Dr. Koperda repeated the referral. *Id.* Dr. Koperda also assessed bilateral pedal edema, which Plaintiff reported was worse at the end of the day. *Id.* He noted he would "oblige pt with cardiac workup" due to family history of coronary artery disease. *Id.*

An echocardiogram performed later that month showed: 1) the left ventricular systolic function was in the lower limit of normal to mildly reduced; 2) the right ventricular cavity size was mildly enlarged; 3) the right atrial cavity size was mildly dilated; 4) mild mitral regurgitation; and 5) mild to moderate tricuspid regurgitation. (Tr. 290). A bone density scan showed osteoporosis in Plaintiff's lumbar spine. (Tr. 286).

In July 2014, Plaintiff saw Rodel Cacas, M.D. at Wilmington Physicians Group, LLC, to establish care. (Tr. 333). She reported depression, anxiety, COPD, osteoporosis, sciatica, and PTSD. *Id.* Plaintiff reported arthralgias/joint pain, and joint stiffness, but no muscle aches or weakness. (Tr. 335). On examination, Dr. Cacas noted normal muscle strength and tone, no tenderness, and full range of motion. (Tr. 336). Her psychiatric examination was normal. *Id.* Dr. Cacas assessed, *inter alia*, PTSD, an inflamed sacroiliac joint, and carpal tunnel syndrome. *Id.*

Plaintiff returned to Dr. Cacas in August 2014 for a sacroiliac joint injection. (Tr. 329-32).

In a visit to a urologist in September 2014, Plaintiff denied back pain, joint pain or swelling, or neck pain, but was noted to have osteopenia. (Tr. 347). Her physical and psychiatric examinations were normal. (Tr. 348).

In October 2014, Plaintiff returned to Dr. Cacas with neck, shoulder, and back pain. (Tr. 324-28). She reported the pain had been worsening for a few week, and that it had waxed and waned for years. (Tr. 326). She reported Advil did not help, and the sacroiliac injection "did not help much". *Id.* Her muscle tone, strength, and range of motion were normal, but she had tenderness in seventeen out of eighteen fibromyalgia points. (Tr. 327). Dr. Cacas assessed "[p]rimary fibromyalgia syndrome", and started Plaintiff on trial medication. *Id.* Her psychiatric examination was normal. *Id.*

Later that month, Plaintiff returned to Dr. Cacas for follow-up. (Tr. 319-23). She reported pain through her shoulders, lower back, and buttock, and that she was "[h]aving a flare" and "having difficulties getting around." (Tr. 321). Dr. Cacas again assessed primary fibromyalgia syndrome, noting the same seventeen out of eighteen positive points. (Tr. 322). He noted Plaintiff did not tolerate previously prescribed medication, and started Plaintiff on a trial of Tylenol 3. *Id.* Her psychiatric examination was again normal. *Id.*

Plaintiff returned to Dr. Cacas again at the end of October 2014. (Tr. 315-18). Dr. Cacas again noted Plaintiff reported arthralgias/joint pain, but no muscle aches or weakness, (Tr. 317). She also reported anxiety and emotional lability but no emotional problems/concerns or depression. *Id.* On examination, Dr. Cacas found tenderness and limited range of motion. *Id.* Her mental status was anxious and depressed. (Tr. 318). Dr. Cacas again assessed primary fibromyalgia syndrome, and noted he would "fill paperwork". *Id.*

In December 2014, Plaintiff had MRIs of her right elbow and left knee. (Tr. 461-62). In her elbow, she had a tendon tear; in her knee, she had an oblique undersurface tear of the medial meniscus posterior horn-body junction and adjacent posterior body segment, small areas of low-grade articular cartilage loss, and small knee joint effusion. *Id.* That same month, Plaintiff saw Andrea Manhart, D.O., about migraines. (Tr. 483-88). Her examination (mental and physical) was essentially normal. (Tr. 487). She was assessed with migraines and prescribed medication. (Tr. 487-88). A follow-up brain MRI showed no acute abnormality. (Tr. 460).

In March 2015, Plaintiff returned to Dr. Manhart regarding her headaches. (Tr. 479-83). Dr. Manhart assessed migraines, neck pain, and muscle tension; she prescribed medication. (Tr. 482-83).

In April 2015, Plaintiff saw Dr. Cacas "to fill out disability paperwork." (Tr. 523). Plaintiff again reported arthralgias and joint pain, but no muscle aches, weakness, or joint stiffness. *Id.* On examination, Dr. Cacas noted Plaintiff had normal tone and strength, but "tenderness" in her joints, bones and muscles. (Tr. 524). Dr. Cacas continued to assess, *inter alia*, primary fibromyalgia syndrome. *Id.*

Plaintiff returned to Dr. Cacas in May 2015. (Tr. 514-19). Plaintiff reported arthralgias and joint pain, but no muscle aches, weakness, or joint stiffness. (Tr. 518). She had normal muscle tone, and strength, but some tenderness. *Id.* Dr. Cacas assessed lateral epicondylitis ("tennis elbow"). *Id.* Later that month, Plaintiff underwent surgery on her elbow. (Tr. 455-56).

In June 2015, Plaintiff saw a physician's assistant at Wilmington Physicians Group regarding her elbow. (Tr. 421). Notes indicate an appropriate range of motion and normal sensation. (Tr. 424). Plaintiff reported still having some pain, but that she felt better than prior to the surgery. (Tr. 425).

In July 2015, Plaintiff underwent multiple sessions of chiropractic care with Randall Fick, D.C., D.A.B.C.O. (Tr. 350-51). She complained of pain and stiffness in her neck, back, and shoulder. (Tr. 350). Dr. Fick found reduced range of motion in the lumbar and thoracic spines, as well as myospasm in the mid thoracic multifidus and the suboccipitals. *Id.*

Plaintiff again saw a physician's assistant at Wilmington Physician's Group about her elbow. (Tr. 415-20). Plaintiff had appropriate range of motion and normal sensation, Tr. 418, but reported increased pain, Tr. 420. The physician's assistant found it "somewhat concerning" that she still had swelling, and performed a corticosteroid injection to address the swelling. *Id.*

Plaintiff returned to Dr. Cacas in July 2015, reporting right elbow and shoulder pain. (Tr. 511-13). Plaintiff reported severe pain right after the steroid injection, and that it was not improving. (Tr. 511). On examination, Plaintiff had some musculoskeletal tenderness. (Tr. 512). Dr. Cacas assessed cubital tunnel syndrome, status post surgery and corticosteroid shot, and prescribed medication pending orthopedic follow-up. *Id.*

In August 2015, Plaintiff returned to Dr. Cacas with right shoulder pain. (Tr. 501-07). She reported reaching movements were the worst, and that she was "[h]aving a hard time in general as it is very aching [sic]". (Tr. 505). On musculoskeletal examination, Dr. Cacas noted full range of motion, but with tenderness. *Id.* He ordered x-rays of Plaintiff's shoulder and neck. (Tr. 506). The shoulder x-ray was normal. (Tr. 454).

In February 2016, Plaintiff returned to Dr. Cacas regarding neck and back pain. (Tr. 496-500). On examination, Dr. Cacas noted full range of motion and tenderness. (Tr. 499). Dr. Cacas assessed, *inter alia*, fibromyositis/fibromyalgia and neck pain. (Tr. 499-90). A follow-up x-ray of Plaintiff's neck showed degenerative changes at C5-6 and C6-7, as well as loss of the normal cervical lordosis. (Tr. 453).

A March 2016 bone density analysis showed "[o]steoporosis but values are essentially stable as compared to prior exams." (Tr. 452). Later that month, Plaintiff underwent an abdominal and pelvic CT scan due to abdominal pain. (Tr. 447). It showed no pancreatic edema, a 2 centimeter low density mass of the left adrenal, and low-density mass lesions of bilateral kidneys, most likely representing cysts. *Id.* Her appendix looked normal, and she had left colon diverticulosis without acute phlegmon. *Id.*

Plaintiff returned to Dr. Cacas for follow-up in April 2016. (Tr. 490-94). Plaintiff reported musculoskeletal symptoms in her neck, shoulders, elbow, knee, foot, ankle, and lower back. (Tr. 493). She again reported arthralgias and joint pain, but no muscle aches or weakness, and no joint stiffness. (Tr. 494). On musculoskeletal examination, Dr. Cacas noted tenderness, bony deformity, and decreased range of motion. *Id.* Dr. Cacas assessed, *inter alia*, osteoarthritis. *Id.*

*Mental Health Evidence*

In December 2014, Plaintiff underwent an initial psychiatric evaluation with Deborah Spradlin, C.N.S., B.C., at Solutions Community Counseling and Recovery Center. (Tr. 354-58). Plaintiff "presented initially tearful and upset", reported past abuse, and described anger problems. (Tr. 354). Plaintiff was well-groomed and made average eye contact; her activity was agitated, and her speech was clear, but pressured. (Tr. 355). Her mood was moderately anxious, and her affect moderately labile. *Id.* Ms. Spradlin noted Plaintiff's insight and judgment were good, and that she was "anxious and depressed with active PTSD symptoms." (Tr. 356). Ms. Spradlin diagnosed PTSD and recurrent depression with psychosis, moderate. *Id.* She prescribed medication, and stated Plaintiff should follow up in six weeks. (Tr. 357).

From July 2014 through May 2016, Plaintiff underwent counseling with Frederick Lewton, P.C.C., at Solutions Community Counseling and Recovery Center. (Tr. 360-406). These notes

indicate Plaintiff had a history of physical abuse, as well as issues with anxiety and anger. *See id.*
In a July 2015 review, Mr. Lewton noted Plaintiff was taking all medications as prescribed, and
that she "rate[d] her anxiety at a 5 which is an improvement." (Tr. 362). Throughout Mr. Lewton's
notes, Plaintiff assessed herself as making progress, or "some progress" toward her therapy goals.
*See* Tr. 371, 373, 375, 377, 379, 381, 383, 385, 388, 391, 394, 397, 401. Upon discharge in May
2016[2], Plaintiff's overall progress in treatment was noted as "improved". (Tr. 366). She was
assessed with PTSD and recurrent depression with psychosis, moderate. (Tr. 365).

*Opinion Evidence*

In August 2014, Plaintiff underwent a consultative psychological evaluation with Taylor
Groneck, Psy.D. (Tr. 298-303). The evaluation "consisted of a clinical interview" and "[a]ll
information provided was Ms. Howell's self-report." (Tr. 298). Plaintiff reported seeking disability
due to COPD, rheumatoid arthritis, sciatica, depression, and anxiety. *Id.* In his functional
assessment, Dr. Groneck found Plaintiff: 1) appeared capable of understanding and remembering
simple job instructions; 2) "would likely have difficulty persisting and working quickly enough
due to preoccupation with her mood symptoms and anxiety"; 3) "would likely have difficulty
maintaining productive work relationships, and "may react out of anger and respond accordingly";
and 4) "would likely experience difficulty coping with even minor workplace pressures." (Tr. 302-
03).

In October 2014, Dr. Cacas completed a "Medical Source Statement of Ability to do Work-
Related Activities (Physical)". (Tr. 307-12). He opined Plaintiff could lift or carry up to ten pounds
occasionally, but never more. (Tr. 307). He listed Plaintiff's fibromyalgia ("17/18 tender points
positive, pain w/ mild palpation") and, as the clinical finding in support of this restriction. *Id.* He

---

2. Plaintiff was discharged because she had moved. (Tr. 365).

opined Plaintiff could: sit for fifteen minutes at a time, up to two hours per day, and stand or walk for ten minutes each in an eight-hour workday, up to one hour total each. (Tr. 308). He opined Plaintiff did not require the use of a cane to ambulate "but sometimes would use a cane for support". *Id.* He concluded Plaintiff could never reach overhead, or push/pull, could occasionally handle things, and frequently finger and feel. (Tr. 309). He found Plaintiff could never climb ladders, scaffolds, ramps, or stairs; balance; stoop; kneel; or crawl, but could occasionally crouch. (Tr. 310). He noted Plaintiff was "unstable with basic up & down movements from sitting, standing" and that she had "difficulty balancing on one foot". *Id.* Dr. Cacas opined Plaintiff should never be exposed to moving mechanical parts, unprotected heights, extreme temperatures, or vibrations, and could occasionally operate a motor vehicle, and be exposed to humidity, wetness, dust, odors, and fumes. (Tr. 311). He opined Plaintiff could need a quiet environment. *Id.* He opined these environmental limitations were due to "uncontrolled PTSD". *Id.* Finally, Dr. Cacas opined Plaintiff could not use public transportation, walk a block at a reasonable pace on a rough or uneven surface, or climb a few steps at a reasonable pace with the use of a slow hand rail. (Tr. 312). Dr. Cacas cited Plaintiff's fibromyalgia and PTSD as the reasons for his restrictions. *Id.*

In November 2014, state agency physician Sreenivas Venkatachala, M.D., reviewed Plaintiff's records and concluded Plaintiff could perform medium work. (Tr. 74). State agency psychologist Bruce Goldsmith also reviewed the records and concluded Plaintiff would be moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. 75). He concluded she would be moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, and would be moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* Dr. Goldsmith noted Plaintiff "would be

precluded from jobs requiring fast pace." *Id.* She was moderately limited in her ability to respond appropriately to supervisors, and her ability to get along with coworkers or peers without distracting them. (Tr. 76). He concluded Plaintiff "would be limited to occasional superficial interactions with others". *Id.* Finally, Dr. Goldsmith assessed that Plaintiff would be moderately limited in her ability to respond appropriately to changes in the work setting. *Id.*

In December 2014, state agency physician Elizabeth Das, M.D., reviewed Plaintiff's records and reached the same conclusions as Dr. Venkatachala. (Tr. 89-90). In January 2015, state agency physician David Denmuth, M.D., also reviewed Plaintiff's records and concluded she retained the mental RFC to complete one to three step tasks, and would be moderately limited in her ability to carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. 91). He opined Plaintiff would be markedly limited in her ability to interact with the general public, and moderately limited in her ability to accept instructions and respond to criticism from supervisors, and the ability to get along with coworkers or peers. (Tr. 91-92). He explained Plaintiff "would be limited to occasional superficial interactions [with] coworkers and supervisor[s] and markedly reduced fo[r] public interactions and would work best in small groups or alone". (Tr. 92). Finally, he opined Plaintiff would be moderately limited in her ability to respond appropriately to changes in the work setting, explaining that her: "mental health issues would cause reduced ability to respond to change but residual remains to complete 1-3 step tasks." *Id.*

In May 2016, Dr. Cacas completed a second Medical Source Statement regarding Plaintiff's physical abilities. (Tr. 408-13). He listed the same physical restrictions as he did in his 2014 opinion, but added osteoarthritis as an additional basis for those restrictions. *See* Tr. 408-09, 413.

VE Testimony

A vocational expert appeared and testified at the ALJ hearing. (Tr. 55-63). In his first hypothetical question, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's past work experience who was:

> limited to medium work. . . . can perform simple tasks, can perform goal oriented work but cannot work at a production rate pace, can occasionally interact with supervisors and coworkers if that interaction is limited to speaking and - - as it is defined in the SCO, but would work best in small groups or alone and cannot interact with the public.

(Tr. 57-58). The VE responded that such an individual could not perform Plaintiff's past work, but could perform other jobs in the national economy. (Tr. 58).

In the second hypothetical, the ALJ asked the VE to consider the same individual, but limited to light work, and with additional limitations of:

> occasionally climb[ing] ramps or stairs, never climb[ing] ladders, ropes or scaffolds, occasionally stoop[ing], kneel[ing], crouch[ing] or crawl[ing,] and can occasionally reach overhead with the right upper extremity and can frequently handle and finger with the right hand.

(Tr. 58-59). The VE again testified such an individual could not perform past work, but identified other jobs in the national economy she could perform. (Tr. 59).

In the third hypothetical, the ALJ asked the VE to consider the same limitations as in the second, but to limit the individual to sedentary work. (Tr. 59-60). The VE again testified such an individual could not perform past work, but identified other jobs in the national economy she could perform. (Tr. 60).

The VE also testified that no job would be available to an individual who was off-task 20% of the time, or absent from work twice per month on an ongoing basis. (Tr. 60-61).

Plaintiff's counsel asked the VE to return to the third hypothetical, and added the following additional limitations:

This person capable of sedentary work can only occasionally lift or carry 10 pounds throughout the day. This person could sit 15 minutes at one time without interruption, stand 10 and walk 10 minutes . . . . This person in a total eight-hour day could sit two hours, stand one, walk one. This person would never reach overhead with their right dominant hand or reach in any other direction with the right dominant hand in performing their job, same with their left hand. They can only occasionally handle objects, fingering and feeling would be frequent, pushing and pulling would be never. For use of their feet would only occasionally be able to use their, either foot for foot controls. This person would never climb stairs or ramps in their job, ladders or scaffolds, they could not balance, stoop, kneel or crawl, they could occasionally crouch. This person would never be at unprotected heights or e around moving mechanical parts, can only occasionally operate a motor vehicle, only occasionally be in humidity or wetness, only occasionally be subject to dust, odors, fumes and pulmonary irritants. They would never be in extreme cold, heat or subject to vibrations, and they would need quiet environment. I want to add to that hypothetical that this person's short-term memory and working memory ability would be marginally adequate, and capable of understanding simple job instructions . . . . Their ability . . . to maintain attention, concentration, persistence and pace would likely become easily distracted by mood symptoms and anxiety, and would have difficulty persisting in working quickly enough due to preoccupation with the mood. I think again going with that . . . I would stick with the 20% off task. I think that would describe enough of these characteristics.

(Tr. 61-63). The VE testified no work would be available to such an individual. (Tr. 63).

ALJ Decision

In his written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since May 9, 2014, and had severe impairments of: osteoarthritis in the back and neck, osteoporosis, depressive disorder, and post-traumatic stress disorder ("PTSD"). (Tr. 23).   The ALJ then found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 24). The ALJ then concluded Plaintiff retained the residual functional capacity ("RFC") to perform:

A reduced range of light work with the following additional limitations[]. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, or crawl. She can perform simple tasks. She can perform goal-oriented work but cannot work at a production rate pace. She can occasionally interact with supervisors and coworkers if that interaction is limited to speaking and signaling as it is defined in the *Selected*

> *Characteristics of Occupations* but she would work best in small groups or alone and cannot interact with the public.

(Tr. 28) (internal citation omitted). Relying on the testimony of the VE, the ALJ concluded Plaintiff was unable to perform any past relevant work, but could perform other jobs that exist in significant numbers in the national economy. (Tr. 31-32). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

14

than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant

is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three objections to the ALJ's decision: 1) the ALJ failed to provide good

reasons for rejecting the opinion of Plaintiff's treating physician; 2) the ALJ's mental RFC is not

supported by substantial evidence because the ALJ "cursorily discredited" the only two medical

sources who examined Plaintiff; and 3) the ALJ failed to properly consider Plaintiff's

15

fibromyalgia. (Doc. 14). The Commissioner responds that the ALJ's decision is supported by substantial evidence. (Doc. 15). For the reasons discussed below, the undersigned recommends reversal.

Fibromyalgia & Dr. Cacas's Opinion

Plaintiff contends reversal is required because the ALJ failed to consider Plaintiff's fibromyalgia as a medically determinable impairment. Additionally, Plaintiff contends the ALJ did not provide the required "good reasons" for discounting Dr. Cacas's opinion, which was based in part on Plaintiff's fibromyalgia. The Commissioner responds that the ALJ appropriately determined Plaintiff's severe impairments, and "expressly recognized Plaintiff's diagnosis of fibromyalgia in his opinion". (Doc. 15, at 16) (citing Tr. 25). She also contends the ALJ gave good reasons for the weight assigned to Dr. Cacas's opinion. For the reasons discussed below, the undersigned agrees with Plaintiff on this point, and recommends the Commissioner's decision be reversed and remanded for further proceedings.

The ALJ mentioned Plaintiff's diagnosis of fibromyalgia once in his opinion, at Step Three. He explained:

> Previously, in October 2014, her treating physician Dr. Cacas diagnosed her with fibromyalgia based on the presence of "17 out of 18" trigger points but he had not yet excluded any other reason for her reportedly "waxing and waning" pain symptoms "for years", as the guidance found in SSR 12-2p (Ex. 8F, pp. 5, 10, 14).

(Tr. 25). He then summarized some of Dr. Cacas's records in evaluating whether Plaintiff had a physical condition that met or equaled the severity of a Listed impairment, noting:

> By 2015, the claimant's neck pain symptoms became her primary physical ailment, as evidenced by a few chiropractic treatments in July 2015.

> According to an X-ray of the claimant's cervical spine on March 3, 2016, the claimant was diagnosed with degenerative changes at C5-C6 and C6-C7. Accordingly, the undersigned finds that the claimant's chronic pain symptoms in her neck had an underlying organic nature.

16

Although the claimant has reported radiculopathy down her right upper extremity, the longitudinal objective medical evidence fails to reveal any persistent abnormalities consistent with the "paragraph A" criteria of Listing 1.04. Specifically, Dr. Cacas has observed longitudinally that the claimant has tenderness but normal motor functioning[,] normal strength, full range of motion of the neck, and no symptoms or signs consistent with nerve root compression. In fact, he diagnosed the claimant with strain of the neck muscle in her active diagnosis list.

Dr. Cacas has recommended conservative treatment modalities for these symptoms, which included narcotic and non-narcotic pain relievers, physical therapy, and chiropractic treatment.

Accordingly, the undersigned finds that the effects of this cervical degenerative disc disease have not imposed limitations consistent with the requisite severity of "paragraph A" of Listing 1.04.

Additionally, the claimant also has an alleged history of back pain.

Although an X-ray of the claimant's lumbar spine from February 24, 2014 was negative for any abnormalities, a DEXA scan from June 30, 2014 indicated bone loss consistent with "osteoporosis of the lumbar spine".

Based on Dr. Cacas's clinical findings of positive trigger points but no gait abnormalities, normal motor tone and strength, and negative straight-leg-raising test results, the undersigned finds that the claimant's back pain symptoms have imposed some discomfort but no persistent pseudoclaudication consistent with the requisite severity described in "paragraph C" of Listing 1.04.

(Tr. 25) (citations to the record omitted).

Social Security Ruling 12-2, Evaluation of Fibromyalgia, "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." SSR 12-2p, 2012 WL 3104869, at *1. To that end, SSR 12-2p describes criteria for establishing that a person has a medically determinable impairment of fibromyalgia, *id.* at *2-3, the sources of evidence the ALJ may look to, *id.* at *3-4, and how a claimant's subjective assertions of pain and functional limitations are evaluated, *id.* at *4. The Ruling also states that fibromyalgia should be analyzed

17

under the traditional five-step evaluation process used for analyzing other claims for SSI. *Id.* at *5-6.

The criteria for establishing a medically determinable impairment of fibromyalgia are: "[a] history of widespread pain—that is, pain in all quadrants of the body . . . that has persisted . . . for at least 3 months"; 2) [a]t least 11 positive tender points on physical examination; and 3) "[e]vidence that other disorders that could cause the symptoms or signs were excluded." *Id.* at *2-3.[3]

Although the ALJ did not explicitly say, he seemingly found Plaintiff's diagnosis of fibromyalgia not to be a medically determinable impairment because he found the third of these criteria was not met. *See* Tr. 25 (" . . . but he had *not yet* excluded any other reason for [Plaintiff's] reportedly 'waxing and waning' pain symptoms 'for years,' as the guidance found in SSR 12-2p") (emphasis added).The ALJ cited only three of Dr. Cacas's records from October 2014 in his paragraph about Plaintiff's fibromyalgia and his conclusion that Dr. Cacas had "not yet" excluded any other reason for Plaintiff's pain. *See* Tr. 25 (citing Tr. 317, 322, 327). The ALJ then went through Plaintiff's physical ailments, pointing out where Plaintiff had been diagnosed with: degenerative changes in her cervical spine, a neck strain,[4] and osteoporosis of the lumbar spine. *Id.*

---

3. A second set of criteria is similar except that "[r]epeated manifestations of six or more "fibromyalgia symptoms" is substituted for the tender point findings. SSR 12-2p, 2012 WL 3104869, at *3.

4. The undersigned notes that the ALJ stated Dr. Cacas "diagnosed the claimant with strain of the neck muscle in her active diagnosis list". (Tr. 25) (citing Tr. 490, 508, 514). However, the records cited (from 2015 and 2016) list "strain of neck muscle" under a list of "Problems" with an explicit notation: "Problems not reviewed (last reviewed 07/07/2014)". Dr. Cacas did assess active neck pain in his assessment in February 2016. (Tr. 499-500).

The Commissioner is correct that failure to find an impairment "severe" is not automatically reversible error. *See, e.g., Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013) (harmless error in failing to find impairment severe so long as ALJ considers all impairments – both severe and non-severe – in the RFC determination). But this does not directly address the situation here. The ALJ did not find Plaintiff's fibromyalgia to be a non-severe impairment, and then consider it in assessing the RFC; rather, he determined Plaintiff's fibromyalgia was not a medically determinable impairment under SSR 12-2 because Dr. Cacas "had not yet excluded any other reason" for Plaintiff's symptoms of pain.[5] (Tr. 25). He never again mentioned fibromyalgia in his opinion, suggesting, as Plaintiff contends, that he found it not to be a medically determinable impairment, and thus determined he need not consider any limitations therefrom in the RFC. However, Dr. Cacas continued to treat Plaintiff through April 2016, prescribing treatment for fibromyalgia, as well as other impairments during that time. *See* Tr. 327 (October 2014 assessment of primary fibromyalgia syndrome and prescribing medication); Tr. 322 (October 2014 assessment of primary fibromyalgia syndrome and changing medication); Tr. 318 (October 2014 assessment of primary fibromyalgia syndrome); Tr. 523-24 (April 2015 treatment note assessing: 1) primary fibromyalgia syndrome—and noting Plaintiff should "cont[inue] current regimen"; and 2) shoulder joint pain); Tr. 499-90 (February 2016 assessment of: 1) fibromyositis/fibromyalgia and prescribing medication; and 2) neck pain). And, in both of his medical opinions—offered in October 2014 and May 2016—Dr. Cacas stated the basis for the opined restrictions was, in part, fibromyalgia. (Tr. 307-12; 408-13). Plaintiff continually reported "arthralgias/joint pain" (Tr. 335, 326, 321, 317, 523, 518, 512, 505, 499, 493); and Dr. Cacas

_____

5. Although the ALJ performed this analysis within "Step Three" of his opinion, the content of the analysis appears to be a "Step Two" analysis. The ALJ did not reference fibromyalgia in his Step Two analysis of severe and non-severe impairments. *See* Tr. 23-24.

continually noted musculoskeletal "tenderness" throughout the record (Tr. 327, 322, 317, 524, 518, 512, 505, 499, 493-94).

This case is analogous to *Starcher v. Comm'r of Social Security*, 2016 WL 5929048 (S.D. Ohio). In that case, the ALJ concluded Plaintiff's fibromyalgia was not a medically determined impairment "because other explanations for his symptoms – specifically rheumatoid arthritis – had not been excluded, and that, under the applicable Social Security Ruling, SSR 12-2p, such exclusion is required". *Starcher*, 2016 WL 5929048, at *4. Similar to *Starcher*, the ALJ's analysis seems to imply that there were other physical causes for Plaintiff's pain (degenerative cervical spine changes, neck muscle strain, osteoporosis), and so he implicitly discounted the treating physician's continuing fibromyalgia diagnosis. *See* Tr. 25. However, here, as in *Starcher*, the treating physician continued to diagnose fibromyalgia *along with* these other impairments, suggesting that diagnoses coexisted. *See, e.g.*, Tr. 523-24 (April 2015 treatment note diagnosing fibromyalgia and shoulder joint pain); Tr. 499-90 (February 2016 treatment note diagnosing fibromyositis/fibromyalgia and neck pain); *see also* Tr. 408 (citing as basis for May 2016 restrictions: "17/18 + tender points for fibromyalgia" and "worsening neck pain due to osteoarthritis"). *See Starcher*, 2016 WL 5929048, at *5 ("The physicians who diagnosed both, and treated both separately, clearly determined that rheumatoid arthritis was both present and did not fully explain Plaintiff's other symptoms; otherwise they would not have diagnosed both conditions."). After the sole reference to October 2014 treatment notes where the ALJ noted Dr. Cacas had "not yet" excluded any other reason for Plaintiff's symptoms, the ALJ never again mentioned Dr. Cacas's fibromyalgia diagnosis.

The undersigned therefore finds the ALJ erred in determining Plaintiff's fibromyalgia was not a medically determinable impairment. And this error affected the ALJ's evaluation of Dr.

Cacas's opinion and thus the physical portion of the RFC analysis. In giving Dr. Cacas's opinion "less weight", the ALJ explained:

> Specifically, based on the claimant's response to conservative treatment modalities and longitudinal objective finding that are discussed in the previous finding, the functional severity of these impairments have imposed greater limitations than the State Agency medical consultants opined but have not precluded her from performing substantial gainful work activity within the scope of a reduced range of light work to the extent described in this finding.

(Tr. 30). The "previous finding" to which the ALJ refers is quoted above, and addresses the objective findings in the record and whether the objective findings support Plaintiff's impairments meeting or equaling a listed impairment. *See* Tr. 25.

The Commissioner attempts to justify the reasons given as appropriate "good reasons", contending that "[t]he ALJ properly determined that the medical evidence of record did not support such extreme limitations." (Doc. 15, at 18). The Commissioner quotes the ALJ's findings that: 1) "Dr. Cacas has observed longitudinally that the claimant has tenderness but normal motor functioning normal strength, full range of motion in the neck and no symptoms or signs consistent with nerve root compression" (Tr. 25); 2) "Dr. Cacas has recommended conservative treatment modalities for [Plaintiff's cervical pain] symptoms, which include narcotic and non-narcotic pain relievers, physical therapy, and chiropractic treatment" (Tr. 25); and notes "the ALJ considered that Dr. Cacas' [sic] made clinic[al] findings of positive trigger points but no gait abnormalities, normal motor tone and strength, and negative straight-leg-raising test results" (Doc. 15, at 18). None of these reasons speak to limitations imposed based on fibromyalgia, which is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months", 2012 WL 3104869, at *2, and "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs", *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). As

the Sixth Circuit has observed, "fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Id.* at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Thus, to discount a treating physician's restrictions opined to be, in part, a result of fibromyalgia by referencing otherwise normal objective testing makes little sense.

As the court explained in *Starcher*: "The error is therefore not harmless, or, at least the Commissioner has not carried the burden of showing that it was, and a remand is in order for the ALJ to properly evaluate the case in light of the diagnosis of fibromyalgia". 2016 WL 5929048, at *4. The undersigned therefore recommends the Court remand to the Commissioner for further evaluation of fibromyalgia as a medically determinable impairment; and to re-evaluate treating physician Dr. Cacas's opinions.

Mental RFC

Next, Plaintiff contends the ALJ's analysis of her mental residual functional capacity lacks the support of substantial evidence. The Commissioner responds the ALJ's decision is supported and should be affirmed. For the reasons discussed below, the undersigned agrees with the Commissioner on this point.

*Dr. Cacas*

Plaintiff first objects that the ALJ failed to provide good reasons for giving "less weight" the opinions of her treating physician, Dr. Cacas. The undersigned finds the ALJ's reasoning for this determination, however, supported by the record.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals

most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

The ALJ explained his decision:

> Psychologically, although the evidence establishes the nature of the claimant's mental impairments, the longitudinal functional severity of these symptoms have decreased gradually over time based on the claimant's compliance with psychotropic treatment modalities prescribed and monitored by Dr. Cacas (Ex. 4F; *but see* Exs. 8F; 9F).

> The undersigned gives less weight to Dr. Cacas's mental residual functional capacity assessment because, although the nature of her mental impairments are established in the record, the claimant's longitudinal mental functioning documented and observed by her various treating sources fail to establish breakthrough episodes of decompensation that have required additional medical intervention, such as therapeutic adjustments on a regular basis and/or formal psychiatric pharmacology management and/or intensive outpatient counseling services (Ex. 4F; *but see* Exs. 2F; 8F; 19F). In fact, during the State Agency-requested consultative examination with Dr. Groneck, the claimant denied any

breakthrough symptoms consistent with active uncontrolled effects of post-traumatic stress disorder, as discussed in the previous finding (Ex. 6F).

(Tr. 30). In his Step Three analysis, the ALJ also discussed the mental health evidence of record in greater detail. (Tr. 26-28). In that analysis, ALJ noted that "although Dr. Cacas has diagnosed the claimant with and treated her for post-traumatic stress disorder, his longitudinal treatment records fail to establish any signs or symptoms that are consistent with active post-traumatic stress disorder" and, "[i]n fact the claimant denied any signs or symptoms of post-traumatic stress disorder to Dr. Groneck during the psychological consultative examination[.]" (Tr. 26). The ALJ's rationale is supported by the record. He cited records from 2014 where Plaintiff reported PTSD to Dr. Cacas, as well as Dr. Cacas's 2014 medical opinion. *See* Tr. 266 (March 2014 notes of: "new problem discussed with me, but has been ongoing for many years"; "[w]as seeing a psychiatrist in the past, but not taking any meds now"); Tr. 269 (April 2014 notes: "PTSD – currently seeing Mr. Lewton with . . . recs [sic] to [tr]ial antianxiolitics. Still having panic attacks and having these daily . . . Feels depressed and anxious as well", and prescribing Klonopin and Zoloft).

The ALJ then compared these to later records, after Plaintiff began taking medication, which do not include references to such extreme symptoms. *See* Tr. 26 (citing Exs. 8F; 19F). A review of the exhibits cited supports the ALJ's reasoning. *See* Tr. 333-37 (July 2014 visit in which Plaintiff reported her Zoloft (sertraline) medication was helping, and that she was "[s]leeping better" and Dr. Cacas assessed, *inter alia,* PTSD, and recommended Plaintiff continue Zoloft, and trial Ativan); Tr. 324-28 (October 2014 note regarding a visit for neck, shoulder, and back pain, in which Plaintiff's psychiatric examination was normal); Tr. 319-23 (October 2014 note regarding a visit for fibromyalgia, in which Plaintiff's psychiatric examination was normal); Tr. 315-18 (October 2014 note: "[u]nable to work due to [fibromyalgia] and severe ptsd; PTSD – seeing a counselor and psychiatry", and referencing a "depressed" and "anxious" mental status, but not

providing any treatment plan for PTSD, only for fibromyalgia); Tr. 520-25 (April 2015 visit in which Dr. Cacas noted "[u]nable to work due to [fibromyalgia] and severe ptsd. PTSD – seeing a counselor and psychiatry. Everything but the bzd is managed by me"; assessed PTSD; and recommended Plaintiff continue Zoloft, discontinue Ativan, and trial valium"); Tr. 501-25 (visits from May to August 2015 for other issues, with no specific mental health issues noted); Tr. 496-500 (February 2016 visit for other issues, an assessment of, *inter alia*, generalized anxiety disorder, and a recommendation to "trial valium"); Tr. 490-95 (April 2016 visit for other issues, with no specific mental health issues noted). Throughout this time period, Dr. Cacas noted continuing prescriptions for Zoloft and Ativan. *See* Tr. 316, 320, 325, 333-34, 502-03, 509, 515, 521. In April 2015, Dr. Cacas added a Valium prescription (Tr. 522), which continued to be noted in Plaintiff's treatment records through April 2016 (Tr. 491, 497-99, 502, 509, 515).

Although Plaintiff is correct that Dr. Cacas documented and treated Plaintiff for PTSD and anxiety issues, the ALJ's conclusion that these records do not support Dr. Cacas's opinion that Plaintiff had "uncontrolled PTSD" causing the specific functional limitations opined, Tr. 311, is supported by the substantial evidence in the record detailed above. And, although Plaintiff argues the "ALJ has failed to specifically identify an instance where Ms. Howell's medication has provided consistent and persistent improvement" (Doc. 14, at 11), the review of records above shows that Plaintiff did not consistently report, nor did Dr. Cacas consistently assess, severe mental health symptoms during the relevant time period. And, during this time period, the medication prescribed by Dr. Cacas remained relatively consistent, supporting the ALJ's conclusion that "the longitudinal functional severity of these symptoms have decreased gradually over time based on the claimant's compliance with psychotropic treatment modalities prescribed and monitored by Dr. Cacas." (Tr. 30).

Moreover, for the same reasons, the ALJ's statement that "the claimant's longitudinal mental functioning documented and observed by her various treating sources fail to establish breakthrough episodes of decompensation that have required medical intervention, such as therapeutic adjustments on a regular basis and/or formal psychiatric pharmacology management and/or intensive outpatient counseling services" (Tr. 30), is also supported by the record.[6] Finally, the ALJ supported his decision by noting Plaintiff herself denied any symptoms consistent with uncontrolled PTSD to the state agency examining psychologist. (Tr. 300) ("She denied indications of delusions, hallucinations, or PTSD.").[7]

Thus, the undersigned concludes the ALJ did not err in the weight he gave to Dr. Cacas's opinion about Plaintiff's mental limitations, and his opinion is supported by substantial evidence in this regard.

*Dr. Groneck*

Plaintiff next objects to the ALJ's decision to give state agency consultative examiner Dr. Groneck's opinion "partial" weight, arguing the ALJ performed a "conclusory analysis" which "does not constitute the necessary articulation requirement to allow for a meaningful judicial review." (Doc. 14, at 13). The Commissioner responds that the ALJ's reasons were appropriate,

---

6. Plaintiff objects to the ALJ's language regarding "breakthrough episodes of decompensation", arguing it is "nothing more than an artificially created hurdle." (Doc. 14, at 11). However, the ALJ's full analysis was that Plaintiff failed to demonstrate "breakthrough episodes of decompensation that have required additional medical intervention, such as therapeutic adjustments on a regular basis and/or formal psychiatric pharmacology management and/or intensive outpatient counseling services". (Tr. 30). Taken in context, it is apparent that the ALJ was comparing to Dr. Cacas's opinion that Plaintiff had "uncontrolled PTSD" to the lack of such supporting evidence of record.

7. Moreover, the undersigned notes Dr. Cacas did not complete a mental RFC form, but stated Plaintiff's mental impairments contributed to his opinions regarding Plaintiff's ability to do physical work-related activities. *See* Tr. 311-12, 413.

and supported by the record. Again, the undersigned agrees with the Commissioner that the ALJ did not err in this regard and recommends the mental RFC decision be affirmed.

In addressing Dr. Groneck's opinion, the ALJ explained:

> The undersigned gives partial weight to Dr. Groneck's State Agency-requested examining psychological opinion because his opinion regarding the claimant's functional severity were based on a snap shot assessment of the claimant's chronic psychological symptoms in 2014, which happen to be inconsistent with the claimant's objective improved response to psychotropic treatment modalities that Dr. Cacas has prescribed in 2015 and 2016[.]

(Tr. 30-31). For the same reasons discussed above, the undersigned finds the second reason offered supported by the record, which showed fewer notes of mental health problems after Plaintiff began taking prescribed medication. Dr. Groneck's opinion was offered in August 2014, prior to the majority of Dr. Cacas's treatment notes. And, the ALJ's decision to discount Dr. Groneck's opinion because it was a "snap shot assessment" of her functioning at a particular point in time is supported for much the same reasons. The ALJ is not required to provide "good reasons" for the weight given to a non-treating physician, but, as Plaintiff points out, "must still 'articulate with specificity reasons for the findings and conclusions that he or she makes.'" (Doc. 14, at 12) (quoting *Bailey v. Comm'r of Soc. Sec.*, 1999 WL 96920, at *4 (6th Cir.)); *see also Ealy* v. *Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) ("good reasons" requirement does not apply to non-treating physician). The undersigned finds the ALJ adequately explained his reasoning for the weight given to Dr. Groneck's opinion here, and no more was required.

Finally, the undersigned notes the ALJ ultimately found Plaintiff had mental limitations on her ability to work:

> She can perform goal-oriented work but cannot work at a production rate pace. She can occasionally interact with supervisors and coworkers if that interaction is limited to speaking and signaling as it is defined in the *Selected Characteristics of Occupations* but she would work best in small groups or alone and cannot interact with the public.

(Tr. 28). In addition to the two opinions discussed above, the ALJ also explained the weight he assigned to the state agency reviewing psychologists:

> The undersigned gives considerable weight to the State Agency psychological consultants' mental and psychiatric review technique assessments to the extent that their opinions are generally consistent with the claimant's significant ameliorative response to psychotropic treatment modalities as documented in the evidence received at the hearing level, as discussed in this finding and the previous finding.

(Tr. 31). In "the previous finding" (the ALJ's Step Three analysis), the ALJ discussed the state agency opinion in greater detail. (Tr. 26-27).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."). The ALJ's conclusion that Plaintiff could work, but not at a production rate pace was supported by Dr. Groneck's finding that Plaintiff appeared capable of understanding and remembering simple job instructions, as well as the State Agency reviewing physicians' opinions (to which the ALJ ascribed "considerable weight" (Tr. 31)) that Plaintiff would be capable of completing one to three step tasks, and would be moderately limited in her ability to carry out detailed instruction, as well as maintain attention and concentration for extended periods. (Tr. 91); *see also* Tr. 75. The ALJ's mental RFC also accounted for Plaintiff's limitations in interacting with others, as opined by Dr. Groneck and the state agency reviewers. Dr. Groneck opined Plaintiff "would likely have difficulty maintaining productive work relationships" and "may react out of anger and respond accordingly". (Tr. 303). The state agency reviewers opined Plaintiff should be limited to "superficial interaction" with others. (Tr. 76, 92).

28

The ALJ explained he gave greater weight to the state agency reviewing physicians than the Dr. Groneck on this point specifically. (Tr. 27). The undersigned therefore concludes the ALJ's mental RFC analysis was supported by substantial evidence in the record.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI not supported by substantial evidence and recommends the decision be reversed and the case remanded for further proceedings consistent with this opinion.


  s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).